BARTO *v.* DETROIT IRON & STEEL CO.

MASTER AND SERVANT—NEGLIGENCE—DUTY TO WARN—SYSTEM.
  A verdict should have been directed for defendant, on the trial
  of an action for negligently killing plaintiff's intestate, an
  employé in the casting room of defendant's iron works,
  killed by the falling of pig iron down a chute, upon decedent
  who had been set to work there without the knowledge of
  the operator of the crane which carried the iron; the testi-
  mony disclosing that a proper system was in operation in the
  factory, and if decedent's fellow-servants had followed their
  instructions and such system, decedent would not have been
  injured.

Error to Wayne; Searl, J., presiding. Submitted
October 4, 1910. (Docket No. 2.) Decided December
30, 1910.

Case by Carlo Barto, as administrator of the estate of
Francis Kopovics, deceased, against the Detroit Iron &
Steel Company. Judgment for plaintiff; defendant brings
error. Reversed.

*Brennan, Donnelly & Van De Mark*, for appellant.
*James R. Neil*, for appellee.

OSTRANDER, J. In February, 1905, a part of the busi-
ness of defendant was casting iron. For this purpose
a building some 200 feet in length and from 60 to 80 feet
wide was used. In one end of the building was a furnace.
In the other, but at some distance from the wall of the
room, was an elevated platform, upon which the pig
breaker was placed, and from which a traveling crane
was operated. Underneath the platform were the rails of
a track running in through a door from outside of the
building; the floor of the casting room being higher than
the level of the ground outside the building and higher

than the tracks.    In the usual course of business, the crane, operated by a man on the platform, lifted from the floor a bed of pigs, carried it to the platform and into position, where each pig, weighing from 85 to 100 pounds, was broken from the sow, and also broken in halves by the blow of a hammer, or plunger, operated by hydraulic power. When broken, the pigs fell through a chute in the platform into a car, and, when the car was filled, it was removed by a locomotive engine and was emptied; another car, or the same car, being returned to a position under the chute.    A stairway led from the platform to the floor of the room.    The operator who controlled the crane and other apparatus faced the casting room.    A helper, sometimes called a "spotter," faced him; the breaker and bed of pigs being between them.

During the night of February 15, 1905, the locomotive of defendant removed a car which had been in place under the chute, and some men, among them the plaintiff's intestate, were employed in removing ice and sand from the tracks, an operation which the cold, the sand from the pigs, and water from the hydraulic apparatus made necessary several times in the course of the day and night.    It appears to be admitted that the operator of the crane was bringing a bed of pigs into position to be broken, when, as was not unusual, one of the pigs was broken off by striking a shield intended to guide the bed into position at the breaker.    The pig came through the chute, and killed plaintiff's intestate.    He was a common laborer, a Hungarian, who had been in America but a few days, and was hired by defendant the evening of the previous day.    He spoke no English.    An administrator of his estate was appointed, who began this suit.

The duties of defendant in the premises, breaches of which are alleged in the declaration, are to provide plaintiff's intestate a safe place in which to work, to instruct him as to the proper manner of performing his work to avoid being injured, to warn him not to go upon the railroad tracks under the chute while the bed of pigs was be-

ing placed in position to be broken, to refrain from direct-
ing him to labor on the tracks under the chute while the
bed of pigs was being placed in position to break, to warn
the operator of the crane that laborers were under the
chute, to cause the operator to desist from bringing the
bed of pigs into position to be broken while the work was
performed under the chute, to warn plaintiff's intestate of
the danger that a pig might come down the chute, and
that defendant " did not establish and maintain a system
of signals whereby said bridge operator could know that
plaintiff's intestate was underneath said chute." The
cause was tried in April, 1909.

Two questions of fact were submitted by the court
to the jury, namely: Did Mr. Sawyer, the operator,
know that the car had been removed from underneath
the chute? and, if he did not, whether defendant pro-
mulgated reasonable rules and regulations to give him
notice. There was a verdict for the plaintiff, which
the court declined to set aside, and judgment was en-
tered on the verdict. The jury found that the operator
did not know that the car had been removed. It is the
contention of appellant that, if he did not have the
knowledge, the fault is that of a fellow-servant of plaintiff's
intestate, who violated the rules and regulations of defend-
ant in failing to give the operator notice. To this point
argument is principally directed. It is contended, also,
that the testimony wholly fails to prove that plaintiff's in-
testate left surviving him a widow and children, that a wid-
ow or children were living at the time of the trial, or that
he had ever contributed to the support of a wife or children.
Further contentions are that the verdict was against the
weight of evidence; that the argument of plaintiff's coun-
sel was intemperate; that hearsay testimony was received.
We shall notice but one, and that the first, of these con-
tentions, because we are satisfied that it was error to sub-
mit to the jury the question of defendant's negligence.

The record does not leave it doubtful that defendant had
a system, which, if followed on the night in question as it

had been theretofore, would have rendered it impossible for the men on the track to be injured or to be in danger of injury by iron falling through the chute. Unfortunately some one was careless. If he knew there was no car in position, the operator was inexcusably negligent in bringing the bed of pigs to a position over the platform. His instructions, his custom, and his experience alike forbade him to do so. If he did not know that the car had been removed, it was his own fault or that of his spotter.

Cars were not taken out unless by his direction, given either personally or through the agency of his spotter to the switchman, whose duty it was to superintend their removal, unloading, and replacing. Sometimes notice to move the car was given by blowing a whistle; often, if the locomotive was alongside the building, by oral direction. The stairway was used by the operator and his spotter to ascertain whether the car was filled and to communicate with the switchman. Upon the occasion in question the spotter had gone down the stairs, was down there when the switchman took out the car, knew the men were cleaning the track. The operator knew that the spotter was not in his usual position to assist him in breaking pigs. The spotter, noticing that the crane was being operated, ascended the stairs to inform the operator that men were under the chute and arrived at the platform too late. Meantime the car had been returned to a position outside of the building, and the switchman was waiting the movements of the men who were clearing the track. There was no occasion to warn the men who were cleaning the tracks, because, if the rules were observed, they were in no danger. Apparently the spotter understood that the operator understood that the car had been removed, until he saw the crane in operation. There is undisputed evidence that the usual method of doing the work corresponded with instructions originally given by defendant's superintendent. The instructions were not in the form of rules, and were not printed. But there was a system, well understood, calculated to insure the safety of plaintiff's in-

testate and all other employés upon the occasion in question. In this respect the case differs essentially from *Pecard* v. *Sugar Co.*, 153 Mich. 84 (116 N. W. 532). We notice the claim of appellee that the liability of defendant is determined in *Barto* v. *Steel Co.*, 155 Mich. 94 (118 N. W. 738). That was error to review a judgment based upon a verdict directed upon the opening statement of plaintiff's counsel. A comparison of what was then offered to be proved with the testimony elicited at the trial will be sufficient to answer the claim which is now made.

The judgment is reversed, and a new trial granted.

BIRD, C. J., and HOOKER, MOORE, and MCALVAY, JJ., concurred.